**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| FIRST AMERICAN TITLE, | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-0473 |
| | § | |
| BRETT C. MOODY INVESTMENTS, | § | |
| LLC, *et al.* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This dispute stems from the 2010 sale of a hotel in Des Moines, Iowa. Moody National Des Moines ("Moody Des Moines") sold the West Des Moines Marriott to IA Lodging. In the parties' contract, Moody Des Moines agreed to pay all property taxes accrued before the closing date. Moody Des Moines deposited the estimated amount, $256,235.00, from its sale proceeds into an escrow account. First American Title Insurance Company ("First American") served as IA Lodging's title insurer and escrow agent. First American concluded that the property taxes had already been paid and conveyed that information to Moody Des Moines, which asked First American to wire the $256,235.00 it had deposited to an affiliated entity, Brett C. Moody Investments ("Moody Investments"). First American was wrong. IA Lodging, the hotel purchaser, paid $252,473.00 in property taxes despite the fact that the sale agreement required Moody Des Moines to do so. First American demanded that Moody Des Moines return the money, without success. First American then reimbursed IA Lodging for the property taxes it had paid. IA Lodging, in turn, assigned First American its claims against Moody Des Moines.

In January 2012, First American sued Moody Des Moines, Moody National Concord ("Moody National"), and Brett Moody in Iowa state court, alleging breach of contract, money had and received, unjust enrichment, and conversion. (Docket Entry No. 1, at 7). The defendants timely removed to the United States District Court for the Southern District of Iowa and counterclaimed for their attorneys' fees. (*Id.*). After discovery, First American moved for summary judgment and added Moody Investments as a defendant. (Docket Entry No. 39). The Iowa district court granted First American's motion for summary judgment on its breach-of-contract claim against Moody Des Moines and on the attorneys' fees counterclaim. The court denied the motion for summary judgment against the newly added defendant, Moody Investments, because it had not been able to conduct discovery. (Docket Entry No. 51, at 1 n.1; *see also* Docket Entry No. 59).[1]

Moody Investments, a Texas corporation, then moved to dismiss for lack of personal jurisdiction. The Iowa court agreed that it lacked personal jurisdiction over Moody Investments and transferred the case to the Southern District of Texas, where jurisdiction was secure. (Docket Entry No. 58, at 8).

In this court, the parties filed amended pleadings, conducted discovery, and filed cross-motions for summary judgment, (Docket Entry Nos. 76, 77), as well as responses and replies. (Docket Entry Nos. 78, 80, 81, 82). First American also moved for partial dismissal of its conversion claim, (Docket Entry No. 79), which this court granted, (Docket Entry No. 84). Only the claims against Moody Investments for unjust enrichment and for money had and received remain.

---

[1] The Iowa court also denied the motion as to Moody National and Brett Moody. (Docket Entry No. 51). The parties later stipulated to the dismissal of all claims against both Moody National and Brett Moody. (Docket Entry No. 53).

Based on the motions, the briefs, the pleadings, the record, and the applicable law, the court denies First American's motion for summary judgment, grants Moody Investment's motion as to the unjust enrichment claim, and denies it as to the money-had-and-received claim, which remains to be tried.  (Docket Entry Nos. 76, 77).  A status and scheduling conference is set for **April 2, 2015**, at 5:00 p.m. in Courtroom 11-B.

The reasons for these rulings are explained below.

## I.    The Legal Standard for Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine [dispute] of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine dispute as to any material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  A dispute "is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the

nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on its pleading allegations. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a "scintilla" of evidence.'" *Little*, 37 F.3d at 1075 (citations omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

When the parties cross-move for summary judgment, the court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (internal quotation marks and alteration omitted). Nevertheless, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2).

## II.    Analysis

First American argues that it is entitled to summary judgment on its claims for unjust enrichment and money had and received because Moody Investments received money by mistake. Moody Investments contends that it is entitled to summary judgment dismissing these claims

because it did not take undue advantage of First American and because it detrimentally relied on

First American's assurances that the money paid belonged to Moody Investments.

### A.      First American's Claim for Unjust Enrichment

"Unjust enrichment occurs when the person sought to be charged has wrongfully secured a

benefit or has passively received one which it would be unconscionable to retain." *Tex. Integrated

Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas

2009, pet. denied).  "A party may recover under the unjust enrichment theory when one person has

obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels

Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  "Unjust enrichment is not a

proper remedy merely because it might appear expedient or generally fair that some recompense be

afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be

charged amount to a windfall."  *Id.* at 42 (internal quotation marks omitted).

"There is considerable confusion as to whether unjust enrichment can stand as an

independent cause of action under Texas law." *Maxwell v. Neri North Am.*, 2014 WL 2441200, at

*5 n.3 (S.D. Tex. May 30, 2014) (citing cases); *see also Eagle Metal Prods., LLC v. Keymark

Enterprises, LLC*, 651 F. Supp. 2d 577, 592 n.49 (N.D. Tex. 2009) (collecting cases).  "Despite the

lack of unanimity among Texas courts, one thing remains clear:  even in the cases [suggesting that

unjust enrichment is not an independent cause of action], the courts have still allowed plaintiffs to

recover based on the theory of unjust enrichment so long as a 'person has obtained a benefit from

another by fraud, duress, or the taking of undue advantage.'" *Amy's Ice Creams, Inc. v. Amy's

Kitchen, Inc.*, — F. Supp. 3d —, 2014 WL 5040055, at *6 (W.D. Tex. Oct. 8, 2014) (quoting

*Baisden v. I'm Ready Prods., Inc.*, No. H–08–0451, 2008 WL 2118170, at *10 (S.D .Tex. May 16,

2008)).

First American alleges that Moody Investments "obtained a benefit from First American by the taking of undue advantage." (Docket Entry No. 73 ¶ 25 (Sixth Amended Complaint); *see also* Docket No. 76, at 15). First American acknowledges, however, that Moody Investments "passively received these funds," (Docket Entry No. 76, at 15). First American has neither submitted nor pointed to summary judgment evidence supporting an inference that Moody Investments obtained the money from First American by fraud, duress, or taking undue advantage. Under Texas law, First American cannot recover on its unjust enrichment claim. *See TSBA, Inc. v. Perkins Ins. Agencies, LLP*, No. 11–10–00170–CV, 2011 WL 1196035, at *4 (Tex. App.—Eastland 2011, pet. struck) ("TSBA's brief does not direct us to any evidence of fraud, duress, or taking an undue advantage by the defendants, and we saw none in our review of the record.").

First American's motion for summary judgment that it is entitled to recover the money on an unjust enrichment claim, (Docket Entry No. 76), is denied. The cross-motion that Moody Investments is entitled to summary judgment dismissing the unjust enrichment claim, (Docket Entry No. 77), is granted.

### B.    First American's Claim for Money Had and Received

A claim for money had and received seeks equitable relief. *Bank of Saipan v. CNG Financial Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (quotations omitted); *Stonebridge Life Ins., Co. v. Pitts*, 236 S.W.3d 201, 203 n. 1 (Tex. 2007) (per curiam); *Edwards v. Mid–Continent Office Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex. App.-Dallas 2008, pet. denied). The claim "'belongs conceptually to the doctrine of unjust enrichment.'" *Edwards*, 252 S.W.3d at 837 (quoting *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.-El Paso 1997, no writ)). A plaintiff must show

6

that a defendant holds money that in equity and good conscience belongs to the plaintiff.  A cause of action for money had and received is "'less restricted and fettered by technical rules and formalities than any other form of action.  It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which . . . belongs to the plaintiff.'"  *Id.* (quoting *Staats v. Miller*, 243 S.W.2d 686, 687–88 (1951)); *see also Charla G. Aldous, P.C. v. Darwin Nat'l Assur. Co.*, No. 3:13–CV–3310–L,  2015 WL 1037489, at *19 (N.D. Tex. Mar. 9, 2015) ("The doctrine is not based on any wrongdoing on the part of the defendant 'but looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another.'" (quoting *Mims v. Stewart Title Guar. Co.*, 521 F. Supp. 2d 568, 574 (N.D. Tex. 2007)); *Bank of Saipan*, 380 F.3d at 840.

In *Edwards v. Mid-Continent Office Distributors, L.P.*, 252 S.W.3d at 837-38, the Texas Court of Appeals surveyed Texas state-court decisions on money-had-and-received claims and gave the following summary:

> Texas courts have allowed restitution for these types of claims in a variety of cases: by a defrauded party against the party who committed the fraud, *see Staats*, 243 S.W.2d at 686–88; *Wiseman v. Baylor*, 6 S.W. 743, 743–44 (Tex. 1887); by a party that made an overpayment, *Benson v. Travelers Ins. Co.*, 464 S.W.2d 709, 710–13 (Tex. Civ. App.-Dallas 1971, no writ); and by a party that paid or credited money to the wrong person or account, *see Amoco Prod. Co.*, 946 S.W.2d at 163–65 (payment to wrong person); *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 710–11 (Tex. App.-Corpus Christi 2006, pet. denied) (payment applied to wrong account); *Lyman D. Robinson Family Ltd. P'ship v. McWilliams & Thompson*, *P.L.L.C.*, 143 S.W.3d 518, 520 (Tex. App.-Dallas 2004, pet. denied) (earnest money released to wrong client).
>
> Conversely, some Texas courts have rejected a claim for restitution and held that money paid under a unilateral mistake of fact cannot be recovered.  *See, e.g., Pacific Molasses Co. v. Graves*, 451 S.W.2d 294, 298 (Tex. Civ. App.-San Antonio 1970, writ ref'd n.r.e.);

*Sellman v. Am. Nat'l Ins. Co.*, 281 S.W.2d 150, 154 (Tex. Civ. App.-Texarkana 1955, writ dism'd). And other courts have held that as between two innocent parties, the party that must suffer the loss is the one that mistakenly created the situation and was in the best position to have avoided it. *See Holden Bus. Forms Co. v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 83 S.W.3d 274, 278 (Tex. App.-Fort Worth 2002, no pet.) (self-insured employer denied restitution of insurance benefits paid to hospital before employer discovered claim not covered by plan); *Lincoln Nat'l Life Ins. Co. v. Rittman*, 790 S.W.2d 791, 794 (Tex. App.-Houston [14th Dist.] 1990, no writ) (insurer denied restitution of benefits paid to hospital after coverage terminated); *Lincoln Nat'l Life Ins. Co. v. Brown Schools, Inc.*, 757 S.W.2d 411, 415 (Tex. App.-Houston [14th Dist.] 1988, no writ) (same).

In some cases, the trial court's ruling was reversed because the intermediate court of appeals concluded that the trial court abused its discretion in affording equitable relief. *See, e.g., London v. London*, 192 S.W.3d 6, 13–14 (Tex. App.-Houston [14th Dist.] 2005, pet. denied) (trial court's order denying father's claim for money had and received reversed on ground that evidence sufficient to support claim for equitable restitution because child support payments were made pursuant to court order later reversed on appeal); *Austin v. Duval*, 735 S.W.2d 647, 649–50 (Tex. App.-Austin 1987, writ denied) (trial court's judgment that holders of lapsed option contract entitled to restitution of earnest money reversed because earnest money forfeited under express terms of option contract); *Singer v. St. Paul Mercury Ins. Co.*, 478 S.W.2d 579, 583 (Tex. Civ. App.-San Antonio 1972, writ ref'd n.r.e.) (trial court's judgment in favor of insured reversed because insurer issued stop-payment order on check when determined no coverage). *See also Pope v. Garrett*, 211 S.W.2d 559, 561–62 (Tex. 1948) (court of appeals' judgment that constructive trust should not be impressed upon interests of defendants who did not participate in wrongful act reversed by supreme court because, but for wrongful acts, innocent defendants would not have inherited property).

*Edwards*, 252 S.W.3d at 837-38 (parallel citations omitted). "The common thread in these decisions is that they are all dependent upon a balancing of the equities in each unique case." *Id.* at 838. "In defending against such a claim, a defendant may present any facts and raise any defenses that would

deny the claimant's right or show that the claimant should not recover." *Hunter v. PriceKubecka, PLLC*, 339 S.W.3d 795, 807 (Tex. App.–Dallas 2011, no pet.).

The parties agree that First American paid Moody Investments $252,473.00 that it was not entitled to receive. Moody Investments asserts defenses against any repayment obligation. The defenses are that (1) First American cannot recover under the voluntary-payment rule; (2) the hotel sale agreement between IA Des Moines and Moody Des Moines required First American to bear the tax-related losses as title insurer; (3) First American has unclean hands; (4) Moody Investments no longer "holds" the money; and (5) Moody Investments materially changed its position to its detriment by distributing the money to its shareholders in reliance on its right to keep the money First American had paid.

Each defense is analyzed below.

### 1.    Whether the Voluntary-Payment Rule Precludes Recovery

"[M]oney voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability." *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009) (quoting *Pennell v. United Ins. Co.*, 243 S.W.2d 572, 576 (Tex. 1951)). "The rule, 'widely used by parties and some Texas courts at one time,' has diminished in scope, as 'the rule's equitable policy concerns have been addressed through statutory or other legal remedies.'" *Id.* (quoting *Peake*, 178 S.W.3d at 771 (noting that "this Court has affirmatively applied the rule only once in the last forty years, and that holding has itself been modified since")).

The tax year in Dallas County, Iowa, runs from July 1 through June 30. Dallas County assesses annual property taxes for two periods: January 1 through June 30, and July 1 through

December 31.  Taxes owed from July 1 to December 31 are due by September 1 of the following

year.  Taxes owed from January 1 through June 30 are due by March 1 of the following year.

(Docket Entry No. 78, Ex. A, at 2).

      The 2009 property taxes assessed on the hotel property totaled $504,946.00.  Under the hotel

sale and closing agreement, Moody National was to pay the taxes due for July 1 through December

31, 2009, out of the sales proceeds it received, and IA Lodging was to receive a corresponding

credit.  The May 11, 2010 closing statement showed a debit of $256,235.00 from Moody National's

sales proceeds for "2009 real estate taxes."  The statement did not reflect a corresponding credit to

IA Lodging.  (Docket Entry No. 80-4, at 1).  First American contacted the taxing authorities shortly

after the May 2010 closing to confirm that the 2009 property taxes had been paid.  First American

was informed that no property taxes were due at that time.  (*Id.* at 3).  First American did not know

that the taxes for July 1 through December 31, 2009, would not become due until September 2010

under the Dallas County assessment schedule.  First American was also unaware that IA Lodging

should have been credited for the taxes that would become due for the July to December 2009

period.  First American contacted Moody National and asked where it should send the money to pay

the property taxes.  Moody National asked First American to pay the money to Moody Investments,

an affiliated (but distinct) company.  First American sent Moody Investments $256,235.00 under

the mistaken assumption that the property taxes had already been paid.  Because First American did

not have "full knowledge of all the facts," the voluntary-payment rule does not preclude its claim

for money had and received.  *Miga*, 299 S.W.3d at 103; *see also Lyman D. Robinson Family Ltd.*

*P'ship v. McWilliams & Thompson, PLLC*, 143 S.W.3d 518, 520 (Tex. App.–Dallas 2004, pet.

denied) ("It is a general rule that money paid under a mistake of fact, that is, an unconscious

ignorance or forgetfulness of a fact, may be recovered.  This is true where, for example, by reason of such a mistake a debt has been paid twice, or the amount paid was in excess of the amount due." (citation omitted)).

The voluntary-payment defense does not bar First American's recovery.

### 2.    Whether the Sale Agreement Precludes Recovery

Moody Investments argues that because the hotel sale agreement between Moody Des Moines and IA Lodging "provides that IA Lodging would look only to First American, its title insurer, if First American 'fail[ed] to disclose any matter affecting the Property or reveal any such matter in an inaccurate, misleading or incomplete fashion or otherwise be in error," First American cannot assert IA Lodging's rights against Moody Investments.  (Docket Entry No. 77, at 5-6 (emphasis removed)).  The sale agreement allowed IA Lodging to seek relief against other parties for "any claim that sellers [Moody Des Moines] agree[d] to cure as set forth in this Agreement." (Docket Entry No. 78, Ex. A-1, ¶ 4.6).  Moody Des Moines agreed to pay "[a]ll taxes related to the ownership, use or income generated by the Property, including . . . property . . . taxes, which accrue[d] prior to the Closing Date or in connection with the sale of the Property."  (*Id.* ¶ 3.13).  This "representation[] and warrant[y]" was "intended for the benefit of the Purchaser," IA Lodging, and "survive[d] the Closing for a period of one (1) year following the Closing Date."  (*Id.* ¶ 3.19). Because First American's claim for money had and received relates to this warranty, the sale agreement does not preclude recovery.[2]

---

[2]  In any event, Moody Investments, unlike Moody Des Moines, was neither a party to, nor a third-party beneficiary of, the sale agreement.  *See In re El Paso Refinery LP*, 302 F.3d 343, 353-54 (5th Cir. 2002) (applying Texas law to hold that a nonparty to a contract could not rely on the contract's terms for allocating environmental cleanup costs between the parties).

### 3.      Whether Unclean Hands Precludes Recovery

Moody Investments also argues that "the clean hands doctrine bars, or at least limits, First American from recovering," because it must show that "it has not contributed to the harm," and "it is undisputed that First American made the mistake of determining that the taxes had been paid and returning the funds to Moody Investments."  (Docket Entry No. 80, at 12).  First American responds by quoting or citing cases stating that "'[o]ne who by innocent mistake delivers his property to another—no matter how stupid or negligent he may have been in doing so—cannot be said to have such unclean hands as to bar him from demanding the return of his property or its value."  *See Thomas v. McNair*, 882 S.W.2d 870, 881 (Tex. App.–Corpus Christi, 1994, no pet.) (quoting *Ligon v. E.F. Hutton & Co.*, 428 S.W.2d 434, 437 (Tex. App.—Dallas 1968, writ ref'd n.r.e.)); *see also In re Jim Walter Homes*, 207 S.W.3d 888, 899 (Tex. App.–Houston [14th Dist.] 2006, no pet.) ("The [unclean hands] doctrine will be applied only to one whose own conduct in connection with the same matter or transaction has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing." (quotations omitted)).

"[T]he cases applying the clean hands doctrine, particularly as a defense to a claim for money had and received, are equivocal as to whether unclean hands (or what relative degree of unclean hands) bar recovery altogether."  *Bank of Saipan v. CNG Financial Corp.*, 380 F.3d 836, 841 (5th Cir. 2004).  "Texas courts have long spoken in terms of weighing the equities, even when foreclosing recovery completely; the inquiry must thus go beyond an analysis of the plaintiff's errors of omission or commission, to balance these against the defendant's unjust acts."  *Id.* (citing *Norris v. Gafas*, 562 S.W.2d 894, 897 (Tex. Civ. App.—Houston 1978) (the unclean-hands doctrine "does not operate to repel all sinners from a court of equity"); *Ligon*, 428 S.W.2d at 437 (negligence does

not make hands so unclean as to bar recovery); *Aetna*, 186 S.W.2d at 842 (a bank may recover

fraudulently obtained funds even if the bank was negligent, provided that the recovery does not pass

the loss to an innocent payee); *Edwards v. Trinity & B.V. Ry. Co.*, 118 S.W. 572, 576 (Tex. Civ.

App. 1909) (there must be a violation of a positive legal duty to bar relief, and then only if the other

party has been prejudiced)).  The unclean-hands defense "operate[s] akin to the way a comparative

(as opposed to contributory) negligence regime does for ordinary tort claims."  *Id.* at 841.

      The *Bank of Saipan* case is instructive.  The plaintiff Bank sued CNG Financial Corporation

for money had and received.  380 F.3d at 838. The Bank had loaned money to a third party to

purchase CNG's subsidiaries.  *Id.*  CNG received the loan proceeds as partial payment for the

subsidiaries, but had to reassume those subsidiaries when the "con-artist purchaser defaulted."  *Id.*

The district court granted judgment as a matter of law to CNG on the Bank's claim for money had

and received in part because the Bank "lacked clean hands."  *Id.* at 839.  The Fifth Circuit reversed

and remanded for trial, *id.* at 838, because at most, "CNG contend[ed] that the Bank [was] guilty of

gross negligence."  *Id.* at 841.  The court could not "say as a matter of law that unclean hands

completely bar[red] recovery," because "if the jury finds that the Bank's actions constituted

negligence but that the Bank presents a cognizable claim, it will have to take that degree of unclean

hands into account and weigh it against the proved misconduct of CNG when determining whether

the amount (if any) of the Bank's loan should be returned to it."  *Id.*

      Moody Investments does not contend, and the record does not support finding, that First

American's mistaken payment was "unconscientious, unjust," "marked by a want of good faith,"

or "violated the principles of equity and righteous dealing."  *See In re Jim Walter Homes*, 207

S.W.2d at 437.  Instead, the arguments—and First American's admissions—"sound[] in negligence"

or "gross negligence at most." *See Bank of Saipan*, 380 F.3d at 842.  As in the *Bank of Saipan* case, the present record does not permit the court to hold, as a matter of law, that First American is barred from any recovery because it had unclean hands.  Instead, the unclean hands defense requires weighing the equities and precludes the court from granting either side's motion for summary judgment.[3]

### 3.   Whether the Fact that Moody Investments No Longer Holds the Money Precludes First American's Recovery

Texas courts have held that holding the money is not required to recover on a claim of money had and received.  *See Pickett v. Republic Nat'l Bank of Dallas*, 619 S.W.2d 399, 400 (Tex. 1981) ("A showing that the Estate no longer has the specific funds is not sufficient to raise a fact issue of prejudicial change of position."); *Greer v. White Oak State Bank*, 673 S.W.3d 326, 329 (Tex. App.–Texarkana 1984, no pet.) ("The fact that Greer no longer has the specific funds does not amount to a change of position."); *cf. Fid. & Deposit Co. of Md. v. Fort Worth Nat'l Bank*, 65 S.W.2d 276, 278 (Tex. Comm'n App. 1933, no pet.) ("[A] collecting bank which accepts a check on another bank on a forged indorsement acquires no title thereto, and holds the proceeds thereof, when collected from the drawee bank, for the rightful owner, who may recover from the collecting bank as for money had and received, even though such bank has fully paid over and accounted for the same to the forger without knowledge or suspicion of the forgery.").  This defense does not bar First American from recovery.

---

[3]  "[T]he unclean hands defense is inapplicable altogether where the plaintiff's sins do not affect or prejudice the defendant."  *Bank of Saipan*, 380 F.3d at 842.  Moody Investments contends that it relied on First American's payment and representation that Moody Investments was entitled to the money when it distributed that money to its investors. *See id.* (observing that the court could not "as a matter of law" resolve the prejudice issue because it was "for a jury to consider these facts and determine questions of unjust enrichment").

14

### 4.   Whether Detrimental Reliance by Moody Investments Precludes First American's Recovery

Moody Investments argues that it "materially changed [its] position in reliance on [First American's] payment" by disbursing the money to its shareholders shortly after receiving it, months before learning that First American had paid by mistake. *See Greer*, 673 S.W.3d at 329. First American argues that this fact is irrelevant under *Pickett v. Republic Nat'l Bank of Dallas*, 619 S.W.2d 399, 400 (Tex. 1981).

*Pickett* involved three years of overpayment of oil and gas royalties to a spendthrift trust and the settlor's estates. The trust's settlors had conveyed oil and gas leases to the trust under the condition that they (and their estates) would receive 65 percent of the royalty payments and the trust would retain 35 percent. These "payments [to the settlors' estates] were to terminate when the oil and gas reserves reduced to certain specified levels." *Pickett v. Republic Nat'l Bank of Dallas*, 601 S.W.2d 405, 406 (Tex. App.–Tyler 1980, aff'd). It was not until 1977 that the engineering firm monitoring production levels "determined that the oil and gas reserves had fallen below the level designated in the trust as of December 1974." As a result, the trustee had mistakenly overpaid $47,442.78 to the estates from 1974 to 1977. *Id.* The estate executors refused to return the payments to the trust, and the trustee sued for money had and received. *Id.* The trial court granted the trustee's motion for summary judgment. The estate executors appealed, arguing that "ordering [them] to make restitution since [they] had paid all monies received to the [estate] beneficiaries and restitution would constitute an inequity to [the executors] who paid the monies in their fiduciary capacities." *Id.* at 407. The Texas appellate court and the Texas Supreme Court affirmed. The Supreme Court stated as follows:

> The Estate complains summary judgment was erroneous. It argues there was a fact issue whether the Estate and Testamentary Trusts changed position to their prejudice after receiving the money. However, there was no summary judgment evidence that the Estate or Testamentary Trusts changed positions or assumed liabilities or obligations they would not otherwise have assumed. The summary judgment evidence was an affidavit stating the money paid to the Estate had been paid out through the Testamentary Trusts. A showing that the Estate no longer has the specific funds is not sufficient to raise a fact issue of prejudicial change of position.

*Pickett v. Republic Nat'l Bank of Dallas*, 619 S.W.2d 399, 400 (Tex. 1981) (per curiam).

Under *Pickett*, although a "showing that the [defendant] no longer has the specific funds" is insufficient as a matter of law to "raise a fact issue of prejudicial change of position," the *Pickett* court did not consider what could raise a fact issue as to detrimental reliance. In that case, there was no summary judgment evidence that the trusts had "changed positions or assumed liabilities or obligations they would not otherwise have assumed." *Id.*

Subsequent Texas cases analyzing money-had-and-received claims, including four cases that discuss *Pickett*, confirm that *Pickett* does not require dismissal if there is evidence of a prejudicial change of position. *See Greer v. White Oak State Bank*, 673 S.W.2d 326 (Tex. App.–Texarkana 1984, no pet.); *Edwards v. Mid-Continent Office Distributors, L.P.*, 252 S.W.3d 833 (Tex. App.–Dallas 2008); *Newington Ltd. v. Forrester*, No. 3:08–CV–0864–G ECF, 2008 WL 4908200 (N.D. Tex. Nov. 13, 2008); *H.E.B., LLC v. Ardinger*, 369 S.W.3d 496 (Tex. App.–Fort Worth 2012, no pet.).

In *Greer v. White Oak State Bank*, 673 S.W.2d 326 (Tex. App.–Texarkana 1984, no pet.), the plaintiff owned a bowling alley subject to two liens. After the bowling alley burned down, Greer received a $490,000 check from his insurer. He endorsed the check and secured the lienholders' endorsement. Before depositing the check, he wrote the lienholders separate checks for $99,561.25

16

and $327,727.54 to settle the outstanding liens.  He then deposited the check in his account at the White Oak State Bank.  The bank "gave Greer immediate credit rather than handling the check as a collection item."  *Id.* at 328.  Based on this credit, the bank paid the lienholders' checks from Greer's account.  *Id.*  It turned out that the "insurance company was insolvent and the drawee bank dishonored the [insurer's $490,000] check."

The White Oak State Bank sued Greer for unjust enrichment and for money had and received.  The trial court found Greer liable to pay $363,464.84.  On appeal, the court acknowledged that "[a] recovery will not be allowed [on a money had and received claim] when the recipient of the funds has materially changed his position in reliance on the payment."  673 S.W.2d at 329 (citing *Bryan v. Citizens Nat'l Bank in Abilene*, 628 S.W.2d 761, 763 (Tex. 1982))).  The court concluded that "the necessary reliance and change of position are not shown in these circumstances" because "Greer . . . delivered his checks to Ford and B & B before he presented the insurance company check to the bank for deposit, and the checks were given to pay liens he was legally obligated to pay in any event."  *Id.* Citing *Pickett*, the court observed that "[t]he fact that Greer no longer has the specific funds does not amount to a change of position."  *Id.*

In *Edwards v. Mid-Continent Office Distributors, LP*, 252 S.W.3d 833 (Tex. App.–Dallas 2008, pet. denied), the plaintiff, Edwards, entered an agreement with MAC, a furniture broker, to purchase the unpaid receivables for three MAC customers "at a discounted value" by "pay[ing] off the suppliers so the furniture could be delivered."  *Id.* at 834.  Edwards called Mid-Continent, one of MAC's furniture suppliers, to verify the amount MAC owed the supplier for the orders the three customers placed.  According to Edwards, Mid-Continent confirmed the balance MAC owed and told Edwards that it "was holding orders for these MAC customers until it received full payment."

17

*Id.*  "Based on this conversation, Edwards did not think he needed to call . . . the other suppliers to confirm that they were also holding orders for these MAC customers."  *Id.* at 834-35 (footnote omitted).  Edwards paid Mid-Continent $28,272.22 and one other supplier, Inwood, $15,292.22, with the understanding that they would send the furniture they were holding to the three MAC customers so that Edwards could collect payment from them.  But MAC's owner had "deceived Edwards."  *Id.* at 835.  The payment that Edwards sent Mid-Continent and Inwood was for past-due balances on already filled orders for other MAC customers, not for the three MAC customers whose receivables Edwards had purchased.  *Id.*  Edwards sued Mid-Continent and Inwood for money had and received.

The trial court held a bench trial and ruled for the defendants, finding that they had both detrimentally relied on Edwards's payment.  The Texas Court of Appeals "agree[d] with Edwards that the evidence" of detrimental reliance was "legally insufficient."  *Id.* at 839.  But the court "disagree[d] that the insufficient evidentiary support for these findings le[d] to the determination that there [was] no support for the trial court's conclusion that Edwards did not meet his burden of proof."  *Id.*  The "absence of proof of detrimental reliance by appellees does not assure Edwards's recovery.  Instead, detrimental reliance is one of the factors that a trial court considers in balancing the equities in a claim for money had and received."  *Id.* at 839-40.  Edwards had the burden to prove that the defendants held money "which in equity and good conscience belonged to him," and the trial court did not abuse its discretion in finding that Edwards failed to meet this burden.  The appellate court emphasized record evidence showing that "Edwards unconditionally paid the amounts he intended to pay to the parties he actually paid," to pay a debt MAC owed, "did not overpay Mid–Continent and Inwood," "did not pay the wrong suppliers," and "was not defrauded

18

by Mid–Continent or Inwood." *Id.* at 841. The trial court did not err in balancing the equities. Although the factors Edwards identified were "some of several types of factors courts may consider in balancing the equities, they [were] not determinative of the outcome." *Id.*

In *Newington Ltd. v. Forrester*, No. 3:08–CV–0864–G ECF, 2008 WL 4908200 (N.D. Tex. Nov. 13, 2008), the defendant argued that the plaintiff's claim for money had and received failed "because he [did] not possess the $200,000, but instead gave it to a third party." *Id.* at *5. Relying on *Pickett*, the court observed that "[t]he Texas Supreme Court has already rejected this exact argument" and concluded that "[t]he fact that Forrester no longer possesses the money is irrelevant." *Id.* (citing *Pickett*, 619 S.W.2d at 399). The *Newington* defendant had prematurely transferred the money despite the fact that the plaintiff "had its agent send explicit written instructions to Forrester to hold the money" until the deal was finalized. *Id.* at *1. The *Newington* court did not address detrimental reliance. *See id.*

In *H.E.B., LLC v. Ardinger*, 369 S.W.3d 496 (Tex. App.–Fort Worth 2012, no pet.), the appellate court considered and rejected the defendant's challenge to the trial court's conclusion that it did "not matter that [the defendant] allegedly spent the $1.3 [million]" the plaintiff sought to recover. 369 S.W.3d at 516. After observing that *Pickett* "held that the defendant was liable under a money-had-and-received claim even though it no longer held the money," *id.* (citing *Pickett*, 619 S.W.2d at 400), the court "construe[d the challenged] conclusion of law [] as an attempt to express this point of law, not a conclusion that the trial court did not consider detrimental reliance, if any, by [the defendant] when weighing the equities." *See id.* In a footnote, the court noted that the statement in *Newington* that "[t]he fact that [Appellee] no longer possesses the money is irrelevant'"

19

could be the "source of the language used in [the challenged] conclusion of law." *Id.* (quoting *Newington*, 2008 WL 4908200, at *5).

Several other cases have not cited *Pickett* but have stated the same principal.  In *Doss v. Homecoming Financial Network, Inc.*, 210 S.W.3d 706 (Tex. App.–Corpus Christi 2006, pet. denied), for example, the plaintiff-bank mistakenly credited a loan payoff to reduce the debt the homeowner's former husband owed, rather than to her loan.  The bank sued the former husband for money had and received.  The trial court ruled in the bank's favor and the appellate court affirmed. The money did not belong to the former husband and there was "no evidence that [he] materially changed his position in reliance on the misapplication of funds, the release of lien, or the escrow account refund." *Id.* at 711.  *See also Bryan v. Citizens Nat'l Bank*, 628 S.W.2d 761, 763 (Tex. 1982) ("Generally, a party who pays funds under a mistake of fact may recover restitution of those funds if the party to whom payment was made has not materially changed his position in reliance thereon."); *Gulf Oil Corp. v. Lone Star Producing Co.*, 322 F.2d 28, 32 (5th Cir. 1963) ("Negligence in paying does not give the payee the right to retain what was not his due, unless he was misled or prejudiced by the mistake.");

These cases show that a defendant cannot establish prejudice merely because it no longer holds money mistakenly paid.  But evidence showing detrimental reliance can and should be considered in weighing the equities on a money-had-and-received claim.  *See H.E.B.*, 369 S.W.3d at 516; *Chesapeake Operating, Inc. v. Whitehead*, No. Civ.A. C-10-301, 2011 WL 3813174, at *6 (S.D. Tex. Aug. 26, 2011) ("Detrimental reliance is one of the factors that can be considered in balancing the equities in a claim for money had and received." (citing *Edwards*, 252 S.W.3d at 833)), *aff'd*, 492 F. App'x 469 (5th Cir. 2012); *Bank of Saipan*, 380 F.3d at 843 ("Change of position

20

is but one more factor to consider in the overall balancing of equities, and in the determination of who in good conscience is the rightful owner of the money."). The issue is what showing a defendant must make to raise a fact issue as to detrimental reliance and prejudice.

Moody Investments argues that the critical issue is whether the defendants would have been legally obligated to spend the money regardless of the mistaken payment or whether they had a basis to believe that they were entitled to retain the mistaken payment. (Docket Entry No. 82, at 1); *see Pickett*, 619 S.W.2d at 400 ("[T]here was no summary judgment evidence that the Estate or Testamentary Trusts changed positions or assumed liabilities or *obligations they would not otherwise have assumed*." (emphasis added)); *Greer*, 673 S.W.2d at 329 ("Greer . . . delivered his checks to Ford and B & B before he presented the insurance company check to the bank for deposit, and the checks were given to pay liens he was *legally obligated to pay in any event*. The necessary reliance and change of position are not shown in these circumstances." (emphasis added and citation omitted)).

Moody Investments submitted deposition testimony from its corporate representative that it disbursed the money to its shareholders shortly after receiving assurances from First American that the property taxes had already been paid. Moody Investments was under no legal obligation to pay its shareholders the dividend had First American not paid Moody Investments. It is also undisputed that First American did not tell Moody Investments that the payment was made out of mistake until five months after Moody Investments had sent the funds to its shareholders. (Docket Entry No. 77, Exs. B, D, E, & H, at 11-12, 31)

First American cites *Lyman D. Robinson Family Limited Partnership v. McWilliams & Thompson, PLLC*, 143 S.W.3d 518 (Tex. App.–Dallas 2004, pet. denied), and argues that this case

undermines any distinction between legally obligated and discretionary expenditures.  In *Lyman*, the court concluded that the defendants failed to raise a factual dispute as to detrimental reliance and prejudice even though the defendants had used the overpayment on expenditures they had no obligation to make.  The plaintiff, McWilliams & Thompson, served as an escrow agent on two real estate purchases by the J. Baker Acquisition Company.  *Id.* at 520.  Baker had deposited $20,000 and $15,000 in earnest money with McWilliams & Thompson to hold in escrow for the two transactions.  One of the two transactions was with the Lyman D. Robinson Family Limited Partnership.  That transaction failed, and the Partnership's members "demanded release of the escrowed funds."  *See id.*  The escrow agent "mistakenly released both the $20,000 escrowed under the purchase contract and the $15,000 escrowed under the other transaction involving Baker."  *Id.* Nearly one year later, the escrow agent asked the Partnership to return the $15,000 overpayment. The Partnership's members refused and the escrow agent filed suit.  The trial court found in the escrow agent's favor.  On appeal, the Texas Court of Appeals rejected the defendants' argument that "a fact issue exist[ed] as to whether [they] were misled or prejudiced by the overpayment and subsequent delay in seeking repayment."  *Id.* at 520.  Despite the defendants' "uncontroverted affidavits that they paid taxes on the amount of the overpayment and *made other expenditures in reliance on the accuracy of the payment*," the court could not "conclude that receiving the money to which they were not entitled, claiming it and paying taxes on it, and spending it 'prejudiced'" the defendants.  *Id.* (emphasis added).

Lyman is distinguishable.  The defendants in *Lyman* received $15,000 more than their agreement provided.  They had no basis to conclude that the overpayment belonged to them in "good conscience."  In this case, by contrast, "First American returned funds that had been paid by Moody

[Des Moines, an affiliated company] and accompanied the return with an unequivocal representation that the funds were Moody [Investments's]." (*Id.*). In *Lyman*, the defendants "demanded release of the escrowed funds." 143 S.W.3d at 520. In this case, "First American informed Moody [Des Moines] that First American discovered that the property taxes were already paid, that Moody [Des Moines] was owed this money, and that First American 'would like to reimburse these fees to Moody [Des Moines].'" (Docket Entry No. 82, at 4). Based on these representations, Moody Des Moines directed First American to transfer the money to its affiliate, Moody Investments. Unlike the facts in *Lyman*, a factfinder could conclude that Moody Investments had a reasonable basis to conclude that the money First American paid belonged to Moody Investments and could be distributed to its investors. But the record does not establish that, as a matter of law, Moody Investments does not have to pay any of the money back to First American. A reasonable factfinder could conclude that Moody Investments did not detrimentally rely on the payment in distributing a dividend to shareholders, or that the equities weigh in favor of requiring Moody Investments and First American to share the loss.

Moody Investments has not established that, as a matter of law, its defenses preclude First American from any recovery on its claim for money had and received. To determine whether First American is entitled to all or part of the money "in good conscience," a factfinder must weigh the equities. A trial is the most appropriate mechanism for doing so. *See Gulf Oil Corp. v. Lone Star Producing Co.*, 322 F.2d 28, 31 (5th Cir. 1963) ("The fact that the payor was negligent, or was carelessly ignorant of the facts as to which he was mistaken does not necessarily bar recovery, but may be considered in determining the equities between the parties and may reduce the amount of recovery."); *Edwards*, 252 S.W.3d at 838 ("The common thread in these decisions is that they are

all dependent upon a balancing of the equities in each unique case."); *Stonebridge*, 236 S.W.3d at 207 ("[T]he plaintiffs will have to establish that they paid money to the defendants, either by mistake or fraud, that, in equity or good conscience, should be returned to the plaintiffs. This theory of recovery, therefore, requires individualized inquiry into the state of mind of each plaintiff."); *Charla G. Aldous*, 2015 WL 1037489, at *22 (granting summary judgment on the plaintiff's "money had and received claim in so far as liability is concerned, as there [wa]s no genuine dispute of material fact that Plaintiffs have retained a portion of the judgment to which Defendant [was] entitled," but denying summary judgment as to the amount because a genuine dispute remained "regarding the amount owed by Plaintiffs").

*Chesapeake Operating* is instructive.  In that case, the plaintiff, Chesapeake, had a contract with Whitehead to supply separators for use in oil exploration.  *See* 2011 WL 3813174, at *1 (S.D. Tex. Aug. 26, 2011).  "After paying a number of the Whitehead invoices" totaling $855,175, "Chesapeake discovered that the invoiced . . . separators had never been delivered." *Id.*  Chesapeake sued Whitehead and Cash Flow, which had collected Chesapeake's invoice payments under a contract with Whitehead, alleging breach of contract and money had and received. *Id.* at *1-2.  The court granted Chesapeake's motion for summary judgment on its breach-of-contract claim because there was no genuine factual dispute that it had never received the separators. *Id.* at *6.  The court denied summary judgment on Chesapeake's claim for money had and received.  Chesapeake's Assistant Controller "admitted there was a 'breakdown' in Chesapeake's system that allowed the payments on the invoices to continue when they should not have." *Id.*  The court concluded that "[t]he competing evidence regarding the comparative responsibility between the parties for the mistake in paying the invoices" precluded summary judgment. *Id.* at *7.

After a bench trial, the court found and concluded that "[i]n equity and good conscience, the losses caused by the scheme that Whitehead perpetrated against Chesapeake and Cash Flow, both, should be borne by both Chesapeake and Cash Flow."  2011 WL 4372486, at *5 (S.D. Tex. Sept. 19, 2011).  The court concluded that "[i]n equity and good conscience, one-half of the monies paid by Chesapeake and received by Cash Flow, belong[ed] to Chesapeake," so that "Chesapeake [was] entitled to recover from Cash Flow the sum of $427,587.50."  *Id.* at *6.

In this case, as in *Chesapeake* and many of the Texas state cases weighing the equities in resolving a claim for money had and received, the proper mechanism for resolving the parties' dispute is a trial.  The cross-motions for summary judgment are both denied.

## IV.    Conclusion

First American's motion for summary judgment, (Docket Entry No. 76), is denied.  Moody Investments's motion for summary judgment, (Docket Entry No. 77), is granted as to First American's claim for unjust enrichment but denied as to First American's claim for money had and received.  The parties are ordered to appear for a status and scheduling conference on **April 2, 2015**, at 5:00 p.m. in Courtroom 11-B at 515 Rusk Street, Houston, Texas, 77002.

SIGNED on March 17, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

25